# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### JONESBORO DIVISION

**DANNY LEE**                                                                          **PLAINTIFF**

v.                         **CASE NO. 3:07-CV-00098 BSM**

**NUCOR-YAMATO STEELCOMPANY,**
**LLP, and NUCOR CORPORATION**                                    **DEFENDANTS**

## ORDER

Plaintiff Danny Lee ("Lee") brings this action against Nucor-Yamato Steel Company,

L.L.P. ("NYS") and Nucor Corporation (collectively "defendants") alleging race

discrimination, hostile work environment, and retaliation in violation of Title VII, 42 U.S.C.

§§ 2000e, *et seq*., and 42 U.S.C. § 1981. Defendants have moved for summary judgment,

Lee has responded and defendants have replied. Additionally, defendants have moved to

strike the declarations filed by plaintiff in opposition to the motion for summary judgment.

For the reasons set forth below, defendants' motion for summary judgment is granted in part

and denied in part, and defendants' motion to strike is denied as moot.

## I.  FACTUAL BACKGROUND

Taking the facts in the light most favorable to the nonmovant, plaintiff Danny Lee,

a black man, began working at NYS in 1988 when the mill was still under construction.

Plaintiff's response to statement of facts (Doc. No. 63) ("Stmt. of facts"), ¶ 1. After a few

months, Lee transferred to the shipping department and worked as a shipper/loader. *Id*. at

¶ 2.

While working in the shipping department, Terry Harvey called Lee a nigger, and Lee complained to Wayne Hunt, the department supervisor.  Ex. B, Lee dep., p. 135-37, defendant's motion for summary judgment ("defs.' motion").  At the time, Lee was in line for a promotion to the position of assistant crew leader, and Mike Gurley, the department manager, awarded the job to Jeffrey Hutton, a white employee.  *Id.* at 136-37.  Lee does not know whether Gurley was aware of the complaint.  *Id.* at 137.  In his declaration, Lee states that he believes the disciplines issued to him by Hutton on July 14, 1990; April 20, 1991; July 22, 1991; and August 27, 1991, were issued in retaliation for his complaint against Harvey.  Ex. 1, plaintiff's response to defendants' motion for summary judgment ("pltf.'s resp.").

In July 1992, Lee bid on an a lubricator position in the maintenance department, was interviewed by Rick Ramsdell, and was awarded the lubricator position, which he still holds today.  Stmt. of facts, ¶ 3.  Although he bid on the lubricator position three times, he was passed over for the position for white males, Eddie Scott and James Bryant, the first two times.  Lee was awarded the position the third time.  Ex. A, Lee dep., p. 360, 362-63, defs.' motion.  Lee testified that he also bid on a mill wright position prior to getting the lubricator position.  *Id.* at 358-59.

Ramsdell was Lee's supervisor until 1997, when Ramsdell was promoted to maintenance department manager.  Stmt. of facts, ¶ 4.  In 1997, Jerry Vasser became Lee's supervisor, and after Vasser, Sigmund Penkunas supervised Lee.  *Id.* at ¶¶ 5-6.  Since

2

becoming a lubricator in 1992, Lee has bid on no positions except the lubricator coordinator position. *Id*. at ¶ 7.

Lee testified that he heard Eddie Scott, a lead lubricator at the time, call a black piece of felt board a "nigger board," which Lee reported to Penkunas. Scott, however, was not disciplined. Ex. A, Lee dep., p. 417, defs.' motion. Lee later testified that he believed he reported this incident to Bill Andrews and Jerry Vassar, but neither got back to him. Ex. B, Lee dep., p. 140-41, defs.' motion. In his declaration, Lee indicated that the complaint regarding Eddie Scott was made during the 1992-1996 time period. Ex.1, pltf.'s resp. Lee testified that because of his complaint, he did not receive the lead lubricator position when Scott left the position, although Lee was the "next guy in line." Ex. B, Lee dep., p. 144-45, defs.' motion. The lubricator coordinator position was awarded to Erlwin Daniel, who is black, on June 15, 2003. Stmt. of facts, ¶ 8.

In his declaration, Lee states that he reported "racially motivated signs, symbols, or depictions," including rebel flags on hardhats and on tool boxes, to NYS on October 8, 2003. Ex. 1, pltf.'s resp. Lee also reported other matters including: (1) racial jokes posted in the office of Bill Black, the maintenance planner; (2) that Rod White told him that his father had taught him to kill any "niggers" he saw on the reservation; and (3) that Mark Huff commented that he only liked one "black guy" that he grew up with, but did not care for any others. *Id*. Finally, Lee states that he reported that he had initially been denied, but eventually received, bonus pay while attending a training course, while Steve Broach, a white

employee who attended the training course, did not have his bonus pay withheld at any time. *Id.*

He also testified that in 2003, he saw the letters "KKK," swastikas, and "a toilet is a white man's throne, but a nigger's soup bowl" written in the bathroom, and told one of the more experienced black employees about it. Ex. A, Lee dep., p. 407-08, defs.' motion. At the time of Lee's deposition in 2006, the graffiti had been painted over or erased. *Id.* at 409.

In December 2003, the lawsuit styled *Bennett, et al. v. Nucor Corporation*, *et al.* ("*Bennett*") was filed in the Western District of Arkansas, Case No. 03-11810. Stmt. of facts, ¶ 15. On August 23, 2004, the case was transferred to the Eastern District of Arkansas and assigned to Judge Susan Weber Wright,  Case No. 3:04CV00291, who has set the case for trial on October 19, 2009. *Id.* Lee's brother, Clifton Lee, is a plaintiff in the *Bennett* suit. *Id.* at ¶ 16. Lee became aware of the *Bennett* suit sometime between 2004 and 2005. *Id.* at ¶ 17.

Lee testified that in late 2004 or early 2005, Lonnie Patillo posted a statement made by Andy Rooney on the board which was disparaging towards black people[1] and that Lee discussed it with a coworker, John Bennett, who brought a copy of it to Jerry Vassar. Ex. A, Lee dep., p. 278-82, defs.' motion; Ex. 1, pltf.'s resp. Lee believes that he also spoke with Bill Campbell, a lead man, about it. Ex. B, Lee dep., p. 263, defs.' motion. In his

---

[1]In his deposition, Lee states that this occurred in late 2005. Ex. A, Lee 1st dep., p. 278-82, defs.' motion.

4

declaration, Lee states that although Patillo's name was on the e-mail, nothing was done. Ex. 1, pltf.'s resp.

Lee also states that on April 21, 2005, after complaining about the Andy Rooney statement, he received a three-day suspension for recording two extra hours of work time when he left the plant to go to a doctor's appointment. *Id*; Ex. M-9, defs.' motion. Lee states that he declined to sign the written warning because he did not believe the suspension complied with NYS's progressive discipline policy whereby suspensions are given after a third warning, as he had received no previous warnings. *Id*.; Ex. M-9, defs.' motion.

Lee testified that around May or June 2005, that he found banana peels in his filing cabinet about three times, and he talked to John Bennett about it. Ex. B, Lee dep., p. 247-49, defs.' motion. Lee testified that sardines were poured into his locker six months to a year prior to that, but he did not complain to anyone. *Id*. at 244-45, 250.

Lee testified that he has found various pictures of primates in his work area. *See generally*, Ex. 1, attachments to Lee declaration. For example, he found a picture of King Kong on top of the filing cabinet that contains his drawer in either 2004 or 2005, and believes he showed it to Penkunas within a day or two of finding it. Ex. B, Lee dep., p. 250, defs.' motion. Also, someone put a Gorilla Glue sticker, which has a picture of a gorilla on it, on his locker. Ex. A, Lee dep., p. 404-05. He found a cut out picture of a gorilla on a newspaper titled "New Home" on July 7, 2005, at 6:55 a.m. in his filing cabinet drawer, and found another picture of a gorilla cut out from *National Geographic* before that incident. *Id*. at 234-41; Ex. B, Lee dep., p. 294-298, defs.' motion. Lee believes that he told Penkunas

about the newspaper picture as early as the same day, but no more than a week after finding it, and that he told Rick Smith, the melt shop supervisor, about the newspaper picture.  Ex. A, Lee dep., p. 244, defs.' motion; Ex. B, Lee dep., p. 298, defs.' motion.

Lee testified that around August 7, 2005, the day after he received a subpoena from the child support office at work, he found a photograph of a monkey, with "I didn't do it, Mr. Policeman" written on it, laying beside the computer in the break room, and believes he reported it to Penkunas.  Ex. A, Lee dep., p. 285-88, defs.' motion.  Lee testified that around November 4, 2005, he found a prank driver's license someone created on the desk in the break room with his name on it and a picture of a primate.  *Id*. at 318-321.  Lee testified that, either in December 2005 or January 2006, he found a magazine with a picture of a "big gorilla or ape man or some kind of statue" propped up against something on the break room lunch table, but instead of reporting it, he kept it with the rest of the pictures because he did not feel like it would make any difference.  *Id*. at 257-61, 265, 268; Ex. 1, pltf's resp.  He also testified that he found a picture of a baby monkey in his locker in the maintenance shop.  Ex. A, Lee dep. at 268-69.

Lee states that he told Joe Stratman about all of the pictures he received in the latter part of 2005, but does not believe he told Rick Ramsdell about the newspaper picture.  Ex. A, Lee dep., p. 243-44, 251, 288-89, defs.' motion.  He discussed the photos, as well as not being allowed to share in the overtime and vacation time at work.  *Id*. at 291.

In his declaration, Lee states that on September 24, 2005, Ramsdell put a memo in his file for not attending a safety meeting, which he only learned about at his deposition in 2008,

6

in retaliation for his complaints.  Ex. 1, pltfs.' resp.  He also states that he believes that the notes written by Penkunas regarding Lee's work performance issues, allegedly recorded after he spoke with Lee on November 11, 2004, were written in retaliation for Lee's report regarding the racially offensive driver's license on November 4, 2005.  *Id.*  Lee further states that he believes the December 13, 2005, notice of warning was retaliation for his complaints. *Id.*

Lee testified that he was written up on December 27, 2005, for not improving work performance during and after shut down and for spending too much time on the phone, internet, and in areas he has no business in.  Ex. A, Lee dep., p. 159-161.  Lee disagreed with the write up, but admitted that he went to personal internet sites at times, mostly during his breaks.  *Id.* at 161-66.  Additionally, he testified that he did not believe that Penkunas wrote him up regarding his work performance because of his race, but he believes the other allegations were made because of race.  *Id.* at 166-67.

Specifically, Lee testified that he has used the computer for his personal use once or twice during his four-day-on work schedule for about15 minutes per use, but never longer than an hour.  Ex. B, Lee dep., p. 107, defs.' motion.  He also stated, however, that there had been times when he walked out of the lube shack while still logged on under his name and someone else, specifically Cordell Wells, had come in and used the computer.  *Id.* at 110. He testified that he uses the telephone for less than fifteen minutes a day for personal reasons. *Id.* at 213.

Lee also testified that he goes to the office of the plant nurse, Dennis Woody, because Lee is a first responder and he also checks his glucose count and blood pressure due to health concerns. *Id*. at 215-16. Lee denied that he has not done his job resulting in more work for the maintenance personnel, equipment failures, repairing grease leaks, changing hydraulic filters, and filling hydraulic tanks. *Id*. at 222. He stated that he has always informed operators when he was about to get into the equipment. *Id*. at 223. Lee stated that he turned in the samples for February 4, July 6, October 3, and November 3, but believes that Lou Daniels contaminated some of his samples, although he did not know if someone put Daniels up to doing it or whether it was an act of discrimination or retaliation. *Id*. at 226-27, 229-30.

Lee has provided a statement he contends he submitted to Penkunas on December 29, 2005, which complains about the incidents of racial harassment and hostility. Exs. 1 and 10, pltf.'s resp. Therein, he also provides a response to the notice of warning he received on December 13, 2005, and additional statements of Penkunas dated December 27, 2005. *Id*.

In January 2006, Lee retained counsel. Ex. A, Lee 1st dep., p. 246, defs.' motion. On February 21, 2006, Lee participated in the *Bennett* suit as a witness, as his declaration was attached to the motion for class certification. Stmt. of facts, ¶¶ 19, 21. He gave a deposition in the *Bennett* suit on May 2, 2006.

Lee testified that he saw employees wearing confederate flag do-rags, which were sold in the company store, as late as January 2006, and he saw employees wearing confederate flag stickers on their hard hats as late as April 2006. Ex. A, Lee 1st dep., p. 272, 409, 414-15. Specifically, Patillo wore both a sticker and do-rag, and at least 20 employees wear

confederate flag items. *Id*. at 272, 414-15. Lee also stated that confederate flags were displayed in many areas, including the machinist office, tool boxes, and lockers, and that a confederate flag hung from a crane in the shipping area for more than three years. *Id*. at 418-19.

Lee filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on October 16, 2006. Ex. B, Lee 2nd dep. p. 34, defs.' motion. At that time, the harassment policy of NYS was posted on bulletin board number one, and the paper looked like it had been posted for a while, although Lee first saw it there in 2006. *Id*. at 36-37, 41.

Lee's EEOC charge marks the box titled "Race" and alleges:

1.    I have been employed at the Nucor's facility in Blytheville, Arkansas since August of 1988. My current position is Lubricator.

2.    During my employment, I have been subjected to racially derogatory comments, conduct, pictures, graffiti and symbols. I have seen racially hostile symbols as recently as last week (September 21st 2006). I have Complained about the racially hostile environment, however, no adequate remedial action has been taken and the harassment has been allowed to continue.

3.    I have been discouraged from applying for promotions at the facility because I have witnessed that African-Americans are not given a fair opportunity to advance to higher paying positions in the mill. In the past the company has not posted vacant positions and has preselected employees for promotions.

4.    On information and belief, I have been discriminated against because of my race, African-American, in training, promotion, hostile environment and other terms and conditions of employment.

Ex. J, defs.' motion.

On October 31, 2006, Lee filed a second declaration in the *Bennett* lawsuit.  Stmt. of

facts, ¶ 21.  On April 30, 2007, Lee filed this lawsuit alleging racial discrimination, hostile

work environment, and retaliation in violation of Title VII and 42 U.S.C. § 1981.

Lee testified that on December 12, 2007, he heard an inappropriate racial joke told by

"this contractor with . . . Schueck Steel."  *Id.* at ¶ 22; Ex. B, Lee 2nd dep., p. 166, defs.'

motion.  He reported the joke to Penkunas and Bill Campbell.  Stmt. of facts, ¶ 23;  Ex. B,

Lee dep., p. 166, defs.' motion.  The individual who made the joke was suspended for five

days without pay and apologized for making the joke.  *Id.* at 343; Stmt. of facts, ¶ 25.

The time frame in which the following events allegedly occurred is not clear from the

record, but they appear to have occurred prior to Lee's second deposition on January 15,

2008:  Lee testified that other employees have placed glue and grease on the handles of his

filing cabinet and lock at least ten times.  Ex. B, Lee dep., p. 240-41, defs.' motion.  He also

testified that at some point his locker hinges were welded, his locker hinges were knocked

off, someone else's tool was placed in his locker to make it seem as if he stole it, his hand

cleaner was poured into his boots, and his lock was cut off of his locker.  *Id.* at 244-45.  He

did not complain to anyone about the tool or hand cleaner incidents.  *Id.* at 253.  Lee also

believes that other employees unplugged his radio so the battery would not have power, but

he complained to Penkunas, and the problem was resolved.  *Id.* at 336.

Lee testified that he has not had the opportunity to cover shifts for other employees

taking vacation time, and he attributes this to race.  Ex. A, Lee dep., p. 306-08, defs.' motion.

Although the request for coverage is supposed to be posted for everyone to have the

opportunity to sign up for it, many times the requests are posted with someone else already signed up to cover the shift, and only the white employees are "doing the covering." *Id.*

In his declaration, Lee states that two notes regarding his use of the medic kit to check his high blood pressure and a notice of warning and three-day suspension on March 24, 2008, over a confusion as to whether his vacation days would be covered by Gary Heinrich were made in retaliation for his lawsuit and participation in the *Bennett* suit. Ex. 1, pltf.'s resp. Lee testified that since his second deposition on January 15, 2008, he has been subjected to additional incidents of racial harassment. Ex. C, Lee dep., p. 11, defs.' motion. For example, Lee testified that on April 14, 2008, at 6:00 a.m., he found a picture of a monkey in his filing cabinet drawer, reported it to Penkunas three days later, and Penkunas asked him to bring the picture to himself or Ramsdell. *Id.* at 11, 14-15. Lee testified that Ramsdell left him with the impression that he would be disciplined if he did not bring these matters to his attention immediately in the future, and Lee reported Ramsdell's comments to Doug Jellison. *Id.* at 27-28.

A notice of counseling session was issued on May 19, 2008, for Lee coming in on a "downday" without prior approval. Ex. M-15, defs.' motion. Lee testified that during Penkunas' deposition, Penkunas was writing Lee up and counseling him for not checking grease systems or fixing grease leaks and hydraulic systems, but that when Lee attempted to come in on his day off to take care of these items, he was given the notice of counseling session. Ex. C, Lee dep., p. 70, 77, defs.' motion. Lee testified that there is a policy that employees are to have prior approval from their supervisors if they plan to work on a day off,

but Lee stated that he has also been told by Penkunas in the past that as long as he gets the approval sheet in before his time sheet went in, it is fine. *Id*. at 73-74.

Lee testified that on June 27, 2008, at 7:30 a.m., he found a National Examiner magazine with a picture of a baby monkey on the back in the Lube Shack and a picture of a monkey in *Discover* magazine on a shelf, which he reported to NYS Controller Keith Prevost at 8:10 a.m. that day. *Id*. at 11, 51-53, 57; Stmt. of facts, ¶ 32. Prevost immediately investigated the matter and found that magazines of various types were regularly brought in and left in the Lube Shack by employees for them to read while on breaks. Stmt. of facts, ¶ 34.

Finally, during Lee's second deposition, he testified that Ramsdell treated him fairly while supervising him, and he does not think that Penkunas has ever treated him unfairly because of his race. Ex. B, Lee dep., p. 55, 238, defs.' motion.

## II. SUMMARY JUDGMENT STANDARD

"Summary judgment is proper if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issues of material fact exist and the movant is entitled to judgment as a matter of law." *Nelson v. Corr. Med. Servs*., 533 F.3d 958, 961 (8th Cir. 2008) (citing Fed. R. Civ. P. 56; *Brown v. Fortner*, 518 F.3d 552, 558 (8th Cir. 2008)).

"A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party, however, is not required to support its motion with affidavits or other similar materials negating the opponent's claim.  *Id.*

Once the moving party demonstrates that the record does not disclose a genuine dispute on a material fact, the non-moving party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e).  The plain language of Rule 56(c) mandates the entry of summary judgment against a non-moving party which, after adequate time for discovery, fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial.  *Celotex Corp.*, 477 U.S. at 322.

## III. DISCUSSION

Summary judgment is granted as to any claims Lee may have for failure to promote and as to Lee's Title VII retaliation claim.  Summary judgment is denied as to Lee's 42 U.S.C. § 1981 retaliation and hostile work environment claims, and Lee's Title VII hostile work environment claim.

At the outset, it is noted that a four-year limitations period applies to Lee's 42 U.S.C. § 1981 claims, as well as the 180-day Title VII limitations period.  42 U.S.C. § 2000e-5(e)(1); *Jackson v. Homechoice, Inc.*, 368 F.3d 997 (8th Cir. 2004) (42 U.S.C. § 1981 claims).  It is also noted, however, that the Eighth Circuit has held that "[w]hen Title VII violations are continuing in nature, the limitations period contained in § 2000e-5(e)(1) does

13

not begin to run until the last occurrence of discrimination." *Hukkanen v. Int'l Union of Operating Engineers, Hoisting & Portable Local No. 101*, 3 F.3d 281, 285 (8th Cir. 1993). Also, the Supreme Court has stated that "[p]rovided that *an act contributing to the claim* occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability," although the Court recognized that employers have recourse when a plaintiff unreasonably delays filing a charge. *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115-21 (2002) (emphasis added). The Supreme Court seems to broaden the scope of facts considered when analyzing a hostile work environment claim, as opposed to claims based on discrete discriminatory or retaliatory acts, because "[h]ostile environment claims are different in kind from discrete acts" and "[t]heir very nature involves repeated conduct." *Id*. at 115.

Lee's claims are analyzed with a keen understanding of the restrictions mandated by Supreme Court and Eighth Circuit precedent.

A.    <u>Promotion Claim</u>

To the extent that Lee has filed a failure to promote claim, summary judgment is granted and it is hereby dismissed. Defendants assert that plaintiff Lee cannot establish his prima facie case for racially discriminatory failure to promote. In response, Lee states that he has brought no independent promotion claim; rather, he asserts that the result of the racially hostile environment and retaliation was to discourage him from applying for jobs he would have liked to have had.

14

B.    Retaliation Claim

*1. Title VII Retaliation Claim*

Summary judgment is granted as to Lee's Title VII retaliation claim because he failed to exhaust his administrative remedies.  Therefore, this claim is dismissed.

Defendants assert that summary judgment is proper on Lee's Title VII retaliation claim because he failed to exhaust administrative remedies.  Specifically, defendants state that Lee failed to file a timely charge of discrimination relating to retaliation with the EEOC, noting that Lee did not check the "Retaliation" box on his EEOC charge.  Lee does not address this point.

"A Title VII plaintiff must exhaust administrative remedies before bringing suit in federal court."  *Cottrill v. MFA, Inc.*, 443 F.3d 629, 634 (8th Cir. 2006).  "A claimant must first timely file an administrative charge with the EEOC" setting forth the facts and nature of the charge within 180 days of the discrimination and receive notice from the EEOC of the right to sue.  *Id.* (citing 42 U.S.C. § 2000e-5(e); *Nichols v. Am. Nat'l Ins. Co,* 154 F.3d 875, 886 (8th Cir. 1998)).  "If the EEOC gives the individual a right-to-sue letter following the EEOC investigation, the charge limits the scope of the subsequent civil action because 'the plaintiff may [only] seek relief for any discrimination that grows out of or is like or reasonably related to the substance of the allegations in the administrative charge.'" *Id.* (citing *Nichols,* 154 F.3d at 887).  The Eighth Circuit has continuously held that "retaliation claims are not reasonably related to underlying discrimination claims."  *Wedow v. City of*

15

*Kansas City*, 442 F.3d 661, 673 (8th Cir. 2006) (quoting *Duncan v. Delta Consol. Indus., Inc*. 371 F.3d 1020, 1026 (8th Cir. 2004)).   Therefore, summary judgment is appropriate as to Lee's Title VII retaliation claim for failure to exhaust administrative remedies.

### 2.  42 U.S.C. § 1981 Retaliation Claim

Summary judgment is denied as to Lee's 42 U.S.C. § 1981 retaliation claim.   This claim is analyzed under the *McDonnell Douglas* burden-shifting framework.   *Clegg v. Arkansas Dep't of Corr.*, 496 F.3d 922 (8th Cir. 2007).   "In order to establish a prima facie case of retaliation, the employee must produce evidence:   (1) that he or she engaged in statutorily protected activity; (2) an adverse employment action was taken against him or her; and (3) a causal connection exists between the two events."   *Id*. (internal citations omitted). In evaluating claims of adverse employment actions in retaliation cases, the court must consider the objective standard that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."   *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006) (internal quotations omitted).   If the plaintiff establishes a prima facie case, the court must examine whether the defendants have offered a legitimate, nondiscriminatory reason for their actions and whether plaintiff has presented any evidence that the explanation given is pretextual. *Henthorn v. Capitol Commc'ns, Inc.*, 359 F.3d 1021, 1028 (8th Cir. 2004).

a.      Adverse Employment Action

Defendants assert that Lee cannot establish that an adverse employment action was taken against him because Lee was in no way deterred from complaining about alleged harassment, filing a charge with the EEOC, filing a lawsuit, and assisting in another lawsuit against defendants.  This argument is completely without merit because it ignores that the test is objective rather than subjective and belies common sense.  If the court were to adopt the reasoning of defendants, no plaintiff could ever successfully bring a retaliation claim because filing a lawsuit would be a prerequisite to bringing such a claim, and a plaintiff would have to file a charge with the EEOC to pursue a Title VII retaliation claim.

Nevertheless, defendants assert that the written or verbal warnings or reprimands received by Lee do not rise to the level of adverse employment actions under Eighth Circuit precedent because there were no serious employment consequences.  The Eighth Circuit's post-*White* decisions "have consistently held that, to be materially adverse, retaliation cannot be trivial; it must produce some 'injury or harm.'" *Littleton v. Pilot Travel Centers, LLC*, 568 F.3d 641, 644 (8th Cir. 2009).  "[C]ommencing performance evaluations, or sending a critical letter that threatened 'appropriate disciplinary action,' or falsely reporting poor performance . . . were actions that did not establish a prima facie case of retaliation, absent showings of materially adverse consequences to the employee." *Id.  See also Devin v. Schwan's Home Service, Inc.*, 491 F.3d 778, 786 (8th Cir. 2007) (holding that plaintiff's claim that she was unfairly issued written notices for failure to turn in customer postcards would not have

deterred a reasonable employee from engaging in protected activity because she did not suffer adverse consequences because of the notices).

In *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1060 (8th Cir. 1997), however, the Eighth Circuit stated that reduction of duties, lower performance evaluations, remedial training despite seniority, and "papering" plaintiff's personnel file with negative reports, including two written reprimands, "are the kind of serious employment consequences" that adversely affected plaintiff's position, even if he was not discharged, demoted, or suspended. The court held that such systematic retaliatory conduct against him constituted adverse employment action. *Id.*

Here, Lee points to more than written and verbal warnings. In addition to such discipline, he was suspended on April 21, 2005, and March 24, 2008. Thus, the record is replete with evidence that Lee suffered an adverse employment action.

b.      Causal Connection

Defendants assert that Lee cannot establish a causal connection between any allegedly adverse conduct and protected activity, as almost every instance of conduct about which Lee complained occurred before Lee's protected activity occurred or was known to defendants. Defendants contend that the evidence demonstrates a pattern of Lee attempting to buffer legitimate, warranted discipline he received by bringing a complaint to NYS's attention shortly after receiving discipline. This evidence, however, could be interpreted in more than one way by a jury.

18

Lee has presented evidence contrary to defendant's argument that he only made complaints after being disciplined. Despite this evidence, even if it is assumed that Lee only made complaints after being disciplined, a jury could find that Lee brought complaints after being disciplined because the discipline itself was discriminatory or retaliatory.

Defendants also contend that the first "opposition" by Lee that was known to defendants occurred in February 2006 when Lee prepared a declaration in the *Bennett* case, and thus, there could be no retaliation prior to this date. Lee asserts that his participation in the *Bennett* case is not the only opposition he registered.

There are material issues of fact in dispute regarding the timing of Lee's complaints and disciplinary actions. For instance, Lee claims that he reported the July 7, 2005, newspaper picture to his supervisor within a week of finding it. He also states that he met with Stratman in the latter part of 2005 about all of the primate pictures, as well as other issues. Several written warnings were placed in his file during that time period, although Lee contends that many of the issues raised in these warnings were typically resolved without discipline. Lee also notes that he had no discipline from January 13, 2000, until the "barrage of discipline" that occurred in 2005. The court finds that Lee has submitted evidence sufficient to establish a prima facie case of retaliation.

c.      Reasons for Employment Decisions and Pretext

Defendants further assert that even if Lee can establish a prima facie case of retaliation, they have articulated a legitimate, non-retaliatory reason for their employment

decisions.  Specifically, defendants contend that Lee was counseled and disciplined for legitimate work performance issues and failure to follow work policies and rules. Defendants argue that Lee cannot establish pretext because he has a history of documented performance issues, the questionable temporal proximity is insufficient, and Lee cannot establish a prima facie case, much less a prima facie case strong enough to establish pretext. Defendants also argue that similarly situated employees were treated the same, and Lee cannot prove otherwise.

The evidence presented by Lee in support of his prima facie case  also supports his claim of pretext.  Indeed, the hostile work environment evidence set forth by Lee, referenced below, provides an additional basis upon which a jury could discredit defendants' reasons for its actions.  *See Williams v. ConAgra Poultry Co.*, 378 F.3d 790, 794 (8th Cir. 2004). Summary judgment on Lee's 42 U.S.C. § 1981 retaliation claim is denied.

For the reasons set forth above, defendants' motion for summary judgment as to Lee's 42 U.S.C. § 1981 retaliation claim is denied.

C.      Hostile Work Environment Claim

Defendants' motion for summary judgment as to Lee's hostile work environment claim is denied.  "Title VII and § 1981 claims alleging a hostile work environment are analyzed under an identical standard."  *Eliserior v. United Steelworkers of America Local 310*, 398 F.3d 1071, 1076 (8th Cir. 2005).  "A hostile environment exists when 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is

sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Gordon v. Shafer Contracting Co.*, 469 F.3d 1191, 1194 (8th Cir. 2006). "Hostile work environments created by supervisors or coworkers have the following elements in common: (1) the plaintiff belongs to a protected group; (2) the plaintiff was subject to unwelcome harassment; (3) a causal nexus exists between the harassment and the plaintiff's protected group status; and (4) the harassment affected a term, condition, or privilege of employment." *Id*. at 1194-95. "In addition, for claims of harassment by non-supervisory personnel, [the plaintiff] must show that his employer knew or should have known of the harassment and failed to take proper action." *Id*. at 1195. "To constitute a hostile work environment, the harassment must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id*. (internal quotations omitted).

When confronting a claim of vicarious liability for harassment by supervisors, a defendant can assert the *Ellerth-Faragher* affirmative defense. *See Joens v. John Morrell & Co.,* 354 F.3d 938, 940 (8th Cir. 2004) (explaining that the *Ellerth-Faragher* defense applies to harassment committed by supervisors, not coworkers). Defendants are vicariously liable for harassment by its supervisory personnel unless they can establish that (1) they exercised reasonable care to prevent and promptly corrected any harassing behavior; and (2) that Lee unreasonably failed to take advantage of the preventive or corrective opportunities provided by defendants. *Gordon*, 469 F.3d at 1195.

Defendants assert that summary judgment is proper on Lee's hostile work environment claim because he cannot establish that he was subjected to severe and pervasive harassment based on his race.   Specifically, defendants contend that the incidents of harassment were too infrequent, remote, and sporadic to constitute pervasive harassment; not directed at or witnessed by Lee; and did not, by Lee's own admission, alter his terms and conditions of employment.

In making this assertion, defendants seem to totally ignore the record which shows that Lee, a black man, was subjected to numerous primate references such as pictures of and statements regarding monkeys and gorillas.   He had to endure racial postings and graffiti. He had to hear racially offensive language such as co-workers telling him that they were raised to kill niggers.   Indeed, on a number of occasions, he had to listen to coworkers using the term nigger.   On a routine bases, he was confronted with the confederate flag, which, although conjuring up delightful emotions in some of a day gone by, is a sign of hate and a racist past to most black people and a is a reminder to others of an attempt to divide and destroy this country.   For these reasons, the court finds that Lee has presented sufficient evidence from which a jury could find harassment sufficiently severe and pervasive to alter the conditions of Lee's employment and to create an abusive working environment. *See, e.g.*, *Green v. Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903, 911 (8th Cir. 2006).

Defendants further assert that Lee unreasonably failed to timely report the alleged harassment and there is no evidence that NYS knew or should have known about the

harassment and failed to address it.  The majority of Lee's allegations involve co-worker harassment, and thus, Lee must show that his employer knew or should have known of the harassment and failed to take proper action.  The court finds that Lee has met this burden for summary judgment purposes, as he has raised questions of fact regarding defendants knowledge and failure to take action.  A complete review of Lee's testimony indicates that in many instances he reported racially hostile conduct to a supervisor, but no action was taken.  Additionally, Lee states he complained about the display of confederate flags in 2003, but that the confederate flag items were worn and sold in the company store as late as January 2006.  Taking the facts in a light most favorable to Lee, summary judgment is not appropriate.

The court need not reach the issue of whether the "other act" evidence and certain statements made in Lee's declaration should be considered on summary judgment.  Even without considering such evidence, the court finds that summary judgment is not appropriate.  Furthermore, insofar as defendants challenge this evidence as impermissible hearsay, speculative, and conclusory, the court disregards any inadmissible statements.  Therefore, defendants' motion to strike is denied as moot.

Accordingly, defendants' motion for summary judgment (Doc. No. 52) is granted in part and denied in part as stated herein.  Defendants' motion to strike (Doc. No. 65) is denied as moot.

IT IS SO ORDERED THIS 30th day of September, 2009.

_____

UNITED STATES DISTRICT JUDGE